IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID WRIGHT,<br><br>    *Plaintiff*,<br><br>v.<br><br>THE CITY OF CHICAGO; KENNETH BOUDREAU; JAMES CASSIDY; J. GANDURSKI; JOHN HALLORAN; RICHARD ZULEY; STEVEN KLACZYNSKI; and COOK COUNTY, ILLINOIS,<br><br>    *Defendants*. | Case No. 24CV2466<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff DAVID WRIGHT, by and through his undersigned attorneys, LOEVY & LOEVY, hereby complains against Defendants THE CITY OF CHICAGO, KENNETH BOUDREAU, JAMES CASSIDY, J. GANDURSKI, JOHN HALLORAN, RICHARD ZULEY, STEVEN KLACZYNSKI, and COOK COUNTY, ILLINOIS, and states as follows:

### INTRODUCTION

1.      Plaintiff David Wright was just 17 years old when he was stolen from his family and subjected to lengthy interrogation where he was given false promises, threatened, and coerced into signing a false "confession" to two murders he did not commit. A staggering tragedy.

2.      This tragedy was no accident. Instead, Wright's wrongful conviction was pursuant to the Chicago Police Department's ("CPD") practice of saying vulnerable people—especially Black youth—confessed though they were coerced or where officers fabricated the "confessions." This practice also involved using Cook County prosecutors to provide "cover" for egregious misconduct, and the County's felony review process was an extension of corrupt CPD customs.

3.     After nearly three decades locked in a cage, Wright was exonerated at 46 years old. With this suit, Wright seeks some measure of justice for the harm Defendants inflicted upon him and to expose and enjoin the systemic practices that caused his wrongful conviction.

## JURISDICTION AND VENUE

4.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress Defendants' actions under the color of law and deprivation of Wright's constitutional rights.

5.     This Court has jurisdiction over Wright's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims pursuant to 28 U.S.C. § 1367.

6.     Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to Wright's claims occurred within this district. Wright and many Defendants reside in this district as well.

## PARTIES

7.     Plaintiff, David Wright, is a 47-year-old resident of Chicago, Illinois. After spending nearly three decades incarcerated for a crime he did not commit, Wright is spending time with his family and focused on putting his life together via educational opportunities he was denied while imprisoned on a natural life sentence, though he was a juvenile.

8.     Defendants Ken Boudreau, James Cassidy, J. Gandurski (Star #2071), John Halloran, and Richard Zuley ("Defendant Officers") are former CPD officers who acted under the color of law and within the scope of their employment at all times relevant herein.

9.     Defendant City of Chicago ("the City") is an Illinois municipal corporation that is or was the employer of the above-named Defendant Officers. The City has *respondeat superior* liability for Defendant Officers' tortious acts under state law and is additionally responsible for the policies and practices of the CPD.

10.     Defendant Steven Klaczynski was an Assistant State's Attorney ("ASA") in the Felony Review Unit ("FRU") of the Cook County State's Attorney's Office ("CCSAO") who also participated in the misconduct alleged herein that resulted in Wright's wrongful conviction. Defendant Klaczynski acted as an investigator alongside Defendant Officers in fabricating evidence under the color of law and within the scope of his employment.

11.     Defendant Cook County ("the County") is a county in Illinois that employed Defendant Klaczynski. The County has *respondeat superior* liability for Defendant Klaczynski's tortious acts under state law and is obligated to indemnify him.

12.     Individual Defendants are sued in their individual capacity unless otherwise noted.

## FACTS

### The Tragic Shooting of Rockett and Smith

13.     On the evening of March 25, 1994, David Wright's childhood friends, Tyrone Rockett and Robert Smith, were tragically shot and killed behind Smith's house in the Englewood neighborhood of Chicago. Smith and Rockett were each shot in the back of the head.

14.     The investigation of the double homicide was conducted by detectives from what was then called Area One Detective Division, at 51st Street and Wentworth, just a few minutes away from the crime scene.

15.     Responding officers spoke with a number of community members who heard the gunshots. None reported seeing David Wright near the crime scene.

16.     Evidence technicians recovered gym shoes, a stocking hat, and grocery bags lying next to the victims' bodies. None of the evidence found at the crime scene implicated Wright.

17.     The investigation of the double homicide ultimately went cold.

**Area One Detectives Unlawfully Arrest David and John Wright**

18.     Nearly six months later, a new team of Area One detectives, comprised of Defendant Officers and led by Defendant Cassidy, took over the case.

19.     Defendant Cassidy has claimed that around August 22, 1994, he received an anonymous call from a woman stating that the individuals responsible for Rockett and Smith's deaths were two Black children named David and John.

20.     The informant provided no basis for this speculation.

21.     Though the "tip" was entirely speculative and uncorroborated, in the early morning hours of August 23, 1994, Defendants Cassidy and Zuley, along with several other Area One officers, arrived unannounced to the Wrights' family home.

22.     Defendant Cassidy first arrested David's older brother, John Wright (who had an outstanding, unrelated warrant).

23.     Cassidy then directed the other officers to capture David Wright.

24.      Officers kicked down doors to the first floor of the home and rushed inside, where 17-year-old David Wright was still asleep in bed. Wright awoke to Defendant Zuley shining a flashlight in his face and pointing a gun at his head.

25.     Wright was arrested and transported back to Area One in handcuffs.

**The Coercive Interrogation of David Wright and Fabrication of Evidence**

26.     At Area One, Wright was placed in a small interrogation room with a desk, a chair, a bench, and steel rings in the wall. He was handcuffed to a steel ring and left in isolation.

27.     Eager to close their case, Defendants Cassidy and Zuley decided to pin the double homicide on David Wright. To fully execute the plan, Cassidy and Zuley first recruited Defendant

Klaczynski to participate in the "investigative" effort, and eventually passed the task of interrogation to Defendants Boudreau and Halloran.

28.     Over the next twelve to fourteen hours, Wright was subjected to coercive, threatening, intimidating, and physically abusive interrogation tactics employed by Defendant Officers that culminated in David signing a false "confession" they had prepared.

29.     The tactics included lies, threats, false promises, false "evidence," and more.

30.     For example, throughout the day, Wright denied involvement in the murders, but Defendant Officers would not accept his denials and called him a liar.

31.     Defendant Officers were, in fact, the ones lying.

32.     Defendant Cassidy took Wright's shoes from him to "photograph and process," claiming they matched the shoes found at the crime scene. This was a false evidence ploy used to pressure Wright to confess.

33.     Employing another lie, Defendant Officers claimed John Wright had implicated Wright in the murders when, in fact, they had fabricated that notion. Defendant Officers showed Wright a document they had coerced from John and fabricated, and that Zuley had signed, claiming John had implicated David—another false evidence ploy.

34.     This was used to pressure David Wright to falsely confess. Defendant Officers prevented Wright, a child, from speaking to an attorney, his parents, or a youth officer, even though his family came to Area One and tried to see him.

35.     Wright continued to deny his involvement and gave his interrogators the names of people he had been with when the murders happened and other people he had seen that night. One of those people was another child, a 15-year-old named Carol who was also John Wright's girlfriend.

5

36.     Defendant Klaczynski, from the CCSAO FRU, arrived at the station midday. Despite the name of the unit, Klaczynski did not have much to "review" and was a participant in the investigation alongside Defendant Officers.

37.     Defendants Zuley and Cassidy brought Defendant Klaczynski into the agreement to falsely implicate Wright.

38.     For example, Defendant Klaczynski went with Defendant Cassidy to the Wright family home and put Carol in the back of a police car. There, surrounded by adult men, Carol was coerced into signing a pre-written "statement."

39.     Defendants confronted Wright about the statement they claimed Carol made as another attempt (and ploy) to convince him to falsely confess.

40.     These efforts at questioning Wright had been going so long that the morning crew (Defendants Zuley and Cassidy) were relieved of duty. Defendants Boudreau and Halloran arrived at Area One to take over the interrogation and to work with Defendant Klaczynski to fabricate false evidence against Wright.

41.     At one point, after Defendants Cassidy and Zuley were relieved of duty but Wright—a child—was not relieved of being questioned by seasoned detectives, Defendant Boudreau grabbed Wright by the throat, choked him, and shoved him up against the wall in response to Wright truthfully denying he had killed his friends.

42.     The theme of lies and threats related to John Wright were pervasive. At some point, Defendant Officers switched course from suggesting John implicated David to suggesting to David that John himself was involved.

43. In this iteration of false promises and threats, Defendant Officers indicated that David, a child, should confess because John, formally an adult, could receive the death penalty; *i.e.*, that David should confess to save his older brother's life.

44. Defendant Halloran told Wright that if he falsely confessed, he would face ten to twenty-five years in prison, but if he did not sign, he would face a much harsher sentence.

45. Wright was also told that if he signed some papers, he would be able to see his family and go home. This, too, was a lie.

46. Defendant Officers and Klaczynski then prepared the false "confession" they had written and false inculpatory statements that had originated with Defendants, not Wright.

47. After 10:30 p.m., after a gun was shoved in his face, and after being exhausted from sleep deprivation and 12-plus hours of psychologically coercive interrogation, and following the false promises of leniency, Wright broke down and signed the papers "confessing to" the murders.

48. The fabricated "confession" is false—Wright did not murder Rockett and Smith, and he did not tell the officers the things in the statement.

49. As part of their practice in taking confessions, Defendants wrote that Wright read part of the handwritten statement to them.

50. The claim Wright read part of the statement to Defendants is false and Wright did not read the statement to the officers. In fact, Wright could not have read the statement as he was illiterate at the time.

51. In addition to the fabricated confession statement, Defendant Officers and Klaczynski wrote reports of the day they interrogated David Wright (and John Wright and Carol). These reports contain knowing false statements, mischaracterize what took place, and are internally contradictory.

52.     Nonetheless, Defendant Officers submitted their fabricated reports and a determination that the case be classified as "cleared and closed by arrest and prosecution" to their supervisor, Defendant Sergeant J. Gandurski.

53.     Defendant Gandurski, an Area One supervisor, knew about the pattern of misconduct (described below) in fabricating and coercing false confessions utilized by Area One detectives, especially those—like Defendants here—who had previously worked under Jon Burge, a CPD commander responsible for torturing countless people into false and coerced confessions.

54.      Defendant Gandurski. knew (or should have known) that this case had classic hallmarks of fabricated confession evidence, especially given the contradictory nature of some of the fabricated reports.

55.     Nonetheless, as part of his role in the agreement to prosecute Wright for crimes he did not commit, Defendant Gandurski approved the closure of the case and signed off on the fabricated CPD documents.

**Criminal Proceedings Result in David Wright's Wrongful Conviction**

56.     No physical evidence ever linked Wright to the murders of his two childhood friends. Nothing in the original investigation of the crime before Defendants became involved pointed to Wright's culpability whatsoever.

57.     Fabricated police reports, handwritten statements, and other documents generated by the Defendant Officers and Klaczynski were used to support the criminal prosecution of Wright for two counts of first-degree murder. Among these fabricated documents was the "confession" the Defendant Officers and Klaczynski claim Wright had made.

58.     There was no probable cause to support the charges against Wright.

59.     At trial, the fabricated confession and other fabricated documents generated by the Defendant Officers and Klaczynski were used in numerous ways against Wright to secure his

conviction and hobble his defense, including being admitted against Wright and in relation to the direct and cross examination of witnesses who testified in the criminal proceedings.

60.     Wright testified at trial that he was innocent; that he was coerced into signing the statement; about the night of the crime and his interactions with Carol; and that the coercion included being physically assaulted by a Defendant Officer.

61.     Despite Wright's innocence, a jury found him guilty of two counts of first-degree murder in 1996. Though a juvenile, Wright was sentenced to life imprisonment without the possibility of parole.

62.     The wrongful convictions were affirmed on direct appeal.

63.     In suppressing favorable information during the criminal proceedings, Defendants did not disclose their own misconduct, including that they had fabricated and coerced evidence against Wright and falsely denied any wrongdoing.

64.     Defendants additionally withheld material exculpatory and impeachment evidence from the prosecution and Wright's defense team in the form of their own pattern and practice of misconduct in other cases.

**David Wright is Exonerated**

65.     Wright never gave up proving his innocence. Wright's wrongful conviction was vacated and Wright was continuously confined in state custody from the date of his arrest in 1994, until September 2022. Even then, Wright's liberty was restrained and he was forced to wear a GPS "ankle" monitor, endure a curfew, and follow other rules restricting his freedom for months.

66.     It took 10,390 days—*i.e.*, 28 years, 5 months, and 10 days—between the time Wright was arrested at 17 and when the charges were dismissed in March 2023.

67.     Wright later obtained a Certificate of Innocence from the court.

**The City of Chicago's Policies, Practices, and Customs
Caused David Wright's Wrongful Conviction**

68.     The City is responsible, by virtue of its policies, practices, and customs, for inflicting miscarriages of justice in scores of incidents like the one Wright endured.

69.     Since 1982, over 150 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to cause the convictions of an innocent person for serious crimes they did not commit.

70.     In these cases, CPD officers used the same or similar tactics Defendant Officers employed against Wright here, including abusing and coercing suspects into falsely implicating themselves, fabricating evidence, or suppressing material information.

71.     At all relevant times, members of the CPD, including Defendant Officers, routinely manufactured evidence against innocent people by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false.

72.     As a matter of widespread custom and practice, members of the CPD, including Defendant Officers, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own, enabling police to secure the wrongful convictions of innocent people.

73.     Over a decade before David Wright was framed via a coercive interrogation, the Defendant City of Chicago had notice that its detectives were terrorizing people into confessing. This practice, which began with Jon Burge and others under his watch at Area Two and then Area Three was in full force in the late 1970s, throughout the 1980s, and into the 1990s and beyond. The City learned about these practices in 1982 when Andrew Wilson and Jackie Wilson were tortured—Andrew was tortured so badly that the jail would not even take him. The City knew, or

should have known, that these practices continued when Burge and other officers tortured Aaron Patterson and Eric Caine in 1986, with Patterson even etching into a bench he had been tortured.

74. The City knew, or should have known, that the coerced and fabricated confession practice extended beyond Areas Two and Three and beyond Burge and his closer associates into other parts of the City and involving other officers in the 1980s and 1990s.

75. For example, in 1991, Defendant Boudreau, with Detective Michael Kill, participated in the coercive interrogation of Anthony Jakes that resulted in a confession that was physically impossible. Jakes was a child at the time. In 1992, Boudreau, with Burge and others, participated in the coordinated coercion of a group of Black teenagers, Damoni Clemon, Iamari Clemon, Jessee Clemon, Tremaine Green, Clinton Welton, and Diyez Owens, none of whom stand convicted despite the claim they "confessed."

76. The City knew, or should have known, that Detective Kriston Kato and others were fabricating and torturing confessions from people out of Area Four Detective Division, including abusing Frederick Seaton in 1988, Michael Waslewski and Daniel Gasca in 1990, and Andre Wallace in 1994.

77. Likewise, the City knew, or should have known that Detective Reynaldo Guevara and others, based out of Area Five, were fabricating and coercing confessions as well, including abusing Victor Vera in 1989, Elizer Cruzido in 1993, and Gloria Ortiz Bordoy in 1995.

78. The City knew, or should have known, that the pattern of coercion reached Area Six. For example, Daniel Taylor, Deon Patrick, Lewis Gardner, Rodney Matthews, Paul Phillips and others were coercively interrogated in 1992 by detectives based out of Area Six.

79. What happened at Area One in the 1990s was no different than the abuse perpetuated in other police Areas, including by Defendant Officers here.

80.     The murder of Rockett and Smith is far from the only time Defendants Halloran and Boudreau, often joined by others, such as Cassidy and Zuley, have worked together to "close" a case regardless of the evidence. Nor is it the first time that these detectives used physical and psychological coercion, including exploiting an existing physical or mental vulnerability, to do so. Rather, as part of the City's larger practices, these detectives have a longstanding pattern of such misconduct.

81.     Numerous men have had charges dropped, been acquitted, or had their convictions overturned, notwithstanding "confessions" taken by Defendants Halloran and/or Boudreau. Examples of individuals against whom Halloran, Boudreau, and their cohorts have coerced or fabricated confessions include, but are not limited to: Mickey Grayer, Johnny Plummer, Clayborn Smith, Harold Hill, Dan Young, Peter Williams, Kilroy Watkins, Tyrone Hood, Wayne Washington, Emmett White, Tyrone Reyna, Miguel Morales, Nicholas Escamilla, John Willer, Raphael Robinson, Fred Ewing, Darnell Stokes, Derrek Flewellen, Anthony Williams, Nevest Coleman, Daryl Fulton, Oscar Gomez, Abel Quinones, Sean Tyler, Reginald Henderson, William Ephraim, Antoine Anderson, Joseph Jackson, Jerome Weathers, and Stanley Gardner. Like the tactics inflicted on Wright, the acts were designed to generate false confessions to crimes, often involving juveniles and sometimes young children.

82.     Defendant Cassidy himself has engaged in systemic misconduct in obtaining false and fabricated confessions. In 1995, Cassidy obtained a false confession from A.M., a child, and in 1998 obtained a "confession" from seven and eight year old children to a rape they did not commit.

86.     Just a few months after interrogating Wright, Boudreau and Cassidy would also use similar tactics to "solve" an Englewood cold case, this time by interrogating and fabricating

statements from Jerry Fincher, Harold Richardson, Vincent Thames, Michael Saunders, and Terrill Swift. While the Fincher statement was suppressed, the other individuals were wrongfully convicted and served significant sentences before being exonerated after DNA evidence proved the confessions were false.

87.     The wrongful convictions of innocent persons include numerous cases in which Chicago police detectives used the very same tactics that Defendant Officers employed against Plaintiff in this case. These tactics include: (a) psychological intimidation and manipulation; (b) the suppression and concealment of exculpatory information, including fabricated information; and (c) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, without regard to their actual guilt.

88.     Before and during the period in which Wright was falsely charged with and convicted of murder, Defendant City knowingly operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the City's disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct. This allowed CPD officers to commit misconduct with impunity.

89.     The City failed to provide adequate training to Chicago police detectives and other officers in many areas, including the following: how to conduct interrogations non-coercively, the preservation and disclosure of favorable material to the accused, minimizing the risks of wrongful conviction, risks of tunnel vision, and need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process.

90.     In fact, some of the City's training encouraged abusive, unconstitutional conduct.

91.     The need for training in these areas was (and remains) obvious. The City's failure to adequately train Chicago police officers caused Wright's wrongful conviction and his injuries.

92.     As evident in Defendant Gandurski's conduct here, the CPD also failed to appropriately supervise its officers. The Department of Justice ("DOJ") issued a report finding systemic deficiencies in supervision and training mirroring the allegations here.

93.     Before and after Wright's arrest, City policymakers and department supervisors condoned and facilitated a code of silence within the CPD. In accordance with this code, officers refused to report and lied about misconduct committed by other officers, including the misconduct at issue in this case.

94.     The City has admitted the code of silence exists.

95.     As a result of these City practices, members of the CPD believe they may, and often do, act with impunity when they violate the constitutional and civil rights of citizens.

96.     Part and parcel of its practice of fostering egregious misconduct, the CPD has a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from witnesses and suspects in criminal cases, which has caused false confessions and led to wrongful convictions, described above.

97.     In so doing, CPD officers systematically suppressed exculpatory and impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

98.     The practice of obtaining coerced and false confessions by CPD has had, for decades, a concomitant practice involving FRU ASAs reporting to the police station to purportedly "memorialize" statements and "confessions" allegedly voluntarily made by the suspect.

99.     The FRU ASAs work alongside officers approving statements, as done here.

100.    At all relevant times, the CCSAO typically staffed the FRU with new, young prosecutors. The FRU attorneys faced pressure to go along with and approve police-generated statements because appeasing police officers could "make or break" their careers. These CPD practices caused Wright harm here, including via the involvement of an FRU ASA here.

101.    The City has condoned, ratified, and sanctioned the kind of misconduct that Defendants committed against Wright in this case. The City (including its final policymaking officials) failed to act to remedy the patterns of abuse described herein, despite knowledge of the pattern of misconduct.

### David Wright's Damages

102.    For twenty-eight years, Wright was forced to live in a cage punished for a crime he did not commit. Wright was required to live in conditions that were inhumane and damaging to his health. During his wrongful incarceration, Wright was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, his mother and grandmothers' funerals, and other life events with loved ones, and was deprived of the fundamental freedom to live his life as an autonomous human being.

103.    Wright was denied educational opportunities and had to teach himself how to read and write using the extremely limited resources available to him.

104.    Wright must now attempt to make a life for himself outside of prison without the benefit of nearly three decades of life experiences, which normally equip adults for the task.

105.    Wright has suffered tremendous damage, including loss of liberty, physical injury, psychological trauma, and emotional damages, all caused by the Defendants' misconduct.

## LEGAL CLAIMS

### COUNT I – 42 U.S.C. § 1983
### Coerced False Confession in Violation of the Fifth Amendment

106.    Each paragraph of this Complaint is incorporated as if restated fully herein.

107.    As described above, Defendant Officers and Klaczynski, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within their scope of employment, forced Wright to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth Amendment.

108.    As described above, Defendant Officers and Klaczynski participated in, encouraged, advised, ordered, and approved an unconstitutional and unlawful interrogation of Wright that caused him to make involuntary and false statements implicating himself in the murders of Rockett and Smith.

109.    The coerced, involuntary, false statements Defendant Officers and Klaczynski fabricated and attributed to Wright were used against him to his detriment in a criminal prosecution.

110.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Wright's clear innocence.

111.    As a direct and proximate result of Defendants' misconduct, Wright suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

112.    The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count VI.

## COUNT II – 42 U.S.C. § 1983
## Violation of Due Process under the Fourteenth Amendment

113.     Each paragraph of this Complaint is incorporated as if restated fully herein.

114.     As described above, Defendant Officers and Klaczynski, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Wright of his constitutional right to due process and a fair trial.

115.     As described above, Defendant Officers and Klaczynski deliberately withheld exculpatory and impeachment evidence from Wright, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Wright's criminal prosecution.

116.     In addition, as described above, Defendant Officers and Klaczynski fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Wright, suborned perjury, obtained Wright's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Wright during his criminal trial.

117.     Defendant Officers and Klaczynski concealed and fabricated additional evidence that is not yet known to Wright.

118.     As described above, Defendant Officers and Klaczynski individually, jointly, and/or in concert and conspiracy, deliberately withheld exculpatory evidence, and destroyed and/or intentionally lost material evidence. In doing so, Defendants violated their clearly established duties to report all material exculpatory and impeachment information to prosecutors, to preserve material evidence, and to ensure the integrity of eyewitness identifications and statements.

119.     The destruction and/or loss of evidence was done in bad faith, and/or was done so Wright could not present obviously exculpatory evidence at trial.

120. Defendant Officers' and Klazcynski's misconduct directly resulted in Wright's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Wright's prosecution would not and could not be pursued, and there is a reasonable probability that the outcome of Wright's criminal case would have been different.

121. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Wright's clear innocence.

122. As a direct and proximate result of Defendants' misconduct, Wright suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

123. The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count VI.

### COUNT III – 42 U.S.C. § 1983
### Liberty Deprivation without Probable Cause in Violation of the Fourth Amendment

124. Each paragraph of this Complaint is incorporated as if restated fully herein.

125. As described above, Defendant Officers and Klaczynski individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, used fabricated evidence to accuse Wright of criminal activity and detain him without probable cause.

126. In so doing, Defendant Officers and Klaczynski caused Wright to be deprived of his liberty and detained without probable cause in violation of his rights secured by the Fourth Amendment and incorporated by the Fourteenth Amendment. Specifically, Wright was incarcerated from the date of his arrest until over twenty-eight years later.

127.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Wright's innocence.

128.    As a direct and proximate result of Defendants' misconduct, Wright suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

129.    The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count VI.

**COUNT IV – 42 U.S.C. § 1983**
**Failure to Intervene**

130.    Each paragraph of this Complaint is incorporated as if restated fully herein.

131.    As described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of Defendant Officers and Klaczynski stood by without intervening to prevent the violation of Wright's constitutional rights, even though they had the opportunity to do so.

132.    Defendant Officers and Klaczynski had a reasonable opportunity to prevent this harm but failed to do so.

133.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to Wright's clearly established constitutional rights.

134.    As a direct and proximate result of Defendants' misconduct, Wright suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

135.     The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count VI.

### COUNT V – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

136.     Each paragraph of this Complaint is incorporated as if restated fully herein.

137.     In investigating the murders of Smith and Rockett, Defendant Officers and Klaczynski, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Wright of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

138.     Additionally, before and after Wright's conviction, Defendant Officers and Klaczynski further conspired to deprive Wright of favorable information to which he was lawfully entitled and which would have led either to not being charged, acquittal, or faster exoneration.

139.     In this manner, Defendant Officers and Klaczynski, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

140.     In furtherance of the conspiracy, each co-conspirator engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, withholding exculpatory evidence, and coercing false statements—and was an otherwise willful participant in joint activity.

141.     As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Wright suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

142. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others and with total disregard for the truth and Wright's clear innocence.

143. The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count VI.

**COUNT VI – 42 U.S.C. § 1983**
**Policy and Practice Claim against Defendant City of Chicago**

144. Each paragraph of this Complaint is incorporated as if fully restated herein.

145. As described in detail above, Defendant City of Chicago is liable for the violation of Wright's constitutional rights because his injuries were caused by the policies, practices, and customs of the City, as well as by the actions of final policymakers for the City.

146. At all relevant times and for a period of time prior thereto, the City and its final policymakers promulgated policies and procedures for the conduct of interrogations and the techniques to be used when questioning criminal suspects.

147. These policies and procedures were implemented by officers of the CPD, including the Defendant Officers who were responsible for interrogating suspects and witnesses in connection with the Rockett/Smith homicide investigation.

148. At all relevant times and for a period of time prior thereto, the City and its final policymakers failed to promulgate proper or adequate policies or procedures for: the conduct of interrogations and techniques to be used when questioning criminal suspects; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; maintenance of investigative files and disclosure of those files in criminal proceedings; disclosure of exculpatory and/or impeaching evidence; the collection, documentation, preservation, and testing of evidence; and conducting photographic and live lineup procedures. The City and its final

policymakers failed to promulgate adequate policies or procedures on these topics (although the need for such policies and procedures was obvious, given the recurring situations faced by officers) in order to prevent the violation of citizens' constitutional rights.

149. In addition, the City and its final policymakers failed to promulgate proper or adequate policies or procedures for training and supervision of CPD officers on these topics.

150. The failure to promulgate proper or adequate policies or procedures was committed by persons with final policymaking authority in the CPD and the City.

151. At all relevant times and for a period of time prior thereto, there existed widespread practices and customs among officers of the CPD, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent or have an attorney present; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers such that the coercive interrogations continued unchecked.

152. In addition, at all relevant times and for a period of time prior thereto, there existed widespread practices and customs among officers of the CPD, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain

proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

153.     At all relevant times and for a period of time prior thereto, the City and its final policymakers had notice of the above-referenced widespread practices and customs. This includes widespread practices and customs under which individuals suspected of criminal activity, such as Wright, were routinely deprived of their right to due process or Fifth Amendment rights. For instance, it was common that suspects were prosecuted based on coerced confessions and fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures, and that exculpatory and impeaching evidence was suppressed.

154.     At all relevant times and for a period of time prior thereto, the City and its final policymakers had notice of widespread practices and customs under which individuals suspected of criminal activity, like Wright, were routinely coerced against their will to implicate themselves in crimes of which they were innocent. It was common for suspects interrogated by the CPD to falsely confess, under extreme duress and after suffering abuse, to committing crimes to which they had no connection and for which there was scant evidence to suggest they were involved.

155.     The widespread practices and customs described above, individually and together, were allowed to flourish because the leaders, supervisors, and final policymakers of the City directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers on these topics, and by failing

to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Wright.

156.    The above-described widespread practices and customs, so well settled as to constitute *de facto* policies of the City, were able to exist and thrive, individually and together, because final policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

157.    The policies, practices, and customs set forth above have resulted in numerous well-publicized false confessions, including the one at issue here, where individuals were convicted of crimes they did not commit after being subjected to abusive interrogation techniques.

158.    In addition, the misconduct described herein was undertaken pursuant to the policies and practices of the City in that the constitutional violations committed against Wright were committed with the knowledge or approval of persons with final policymaking authority for the City or were actually committed by persons with such final policymaking authority.

159.    Defendant Officers acted pursuant to the City's policies, widespread practices, and customs in engaging in the misconduct described in this Complaint. Wright's injuries were directly and proximately caused by the City's policies, widespread practices, and customs.

160.    Specifically, Wright's injuries were caused by the policies, widespread practices, and customs of the City in that officers and employees of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced suspect and witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated constitutional rights in a manner similar to that alleged here.

161.     The widespread practices described in the preceding paragraphs were also allowed to flourish because the City declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and suspect or witness statements, and pursued wrongful convictions.

162.     Indeed, the CPD's systems for investigating and disciplining officers accused of the type of misconduct that harmed Wright were, for all practical purposes, nonexistent. The CPD code of silence effectively eliminated any form of accountability, discipline, or oversight.

163.     Chicago police officers who manufactured criminal cases against individuals like Wright had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter the cost. In this way, the City proximately caused abuses like Defendant Officers' misconduct at issue in this case.

164.     As a direct and proximate result of Defendant City's policies, widespread practices, and customs, Wright suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

**COUNT VII – State Law Claim**
**Malicious Prosecution**

165.     Each paragraph of this Complaint is incorporated as if restated fully herein.

166.     Defendant Officers and Klaczynski, acting as investigators, accused Wright of criminal activity, knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

167.     Defendant Officers and Klaczynski caused Wright to be improperly subjected to judicial proceedings for which there was no probable cause.

168.    These judicial proceedings were instituted and continued maliciously, resulting in injury.

169.    Statements of Defendant Officers and Klaczynski regarding Wright's alleged culpability were made with knowledge that said statements were false and perjured. Defendants also fabricated evidence, coerced false inculpatory statements from witnesses, and withheld exculpatory evidence that would have demonstrated Wright's absolute innocence, destroyed material and/or exculpatory evidence, and used unduly suggestive identification procedures.

170.    Defendant Officers and Klaczynski were aware that, as described more fully above, no true or reliable evidence implicated Wright in the murders of Smith and Rockett.

171.    Defendant Officers and Klaczynski intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Wright, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator. Defendants withheld the facts of their manipulation and the resulting fabrications from Wright.

172.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in disregard of the truth and Wright's innocence.

173.    On March 29, 2023, the prosecution terminated in Wright's favor when all charges against him were dismissed. Wright was also adjudicated innocent.

174.    As a direct and proximate result of Defendants' misconduct, Wright suffered, and continues to suffer, grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT VIII – State Law Claim
## Intentional Infliction of Emotional Distress

175.    Each paragraph of this Complaint is incorporated as if restated fully herein.

176.    The acts and conduct of the Defendant Officers and Klaczynski as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority and were undertaken with intent to cause, or were in reckless disregard of, the probability that their conduct would cause, severe emotional distress to Wright, as is more fully alleged above.

177.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Wright's clear innocence.

178.    As a direct and proximate result of Defendants' misconduct, Wright suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional distress and damages, as set forth above.

### COUNT IX – State Law Claim
### Civil Conspiracy

179.    Each paragraph of this Complaint is incorporated as if restated fully herein.

180.    As described above, Defendant Officers and Klaczynski, acting in concert with other known and unknown co-conspirators, reached an agreement among themselves to frame Wright for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Wright of these rights.

181.    In furtherance of the conspiracy, Defendant Officers and Klaczynski committed overt acts and were otherwise willful participants in joint activity including, but not limited to, the malicious prosecution of Wright and the intentional infliction of emotional distress upon him.

182.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Wright's clear innocence.

183.     As a direct and proximate result of Defendants' conspiracy, Wright suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT X – State Law Claim
### Willful and Wanton Conduct

184.     Each paragraph of this Complaint is incorporated as if fully restated herein.

185.     At all times relevant herein, Defendant Officers and Klaczynski had a duty to refrain from willful and wanton conduct in connection with the Rockett/Smith murder investigation.

186.     As described herein, it was foreseeable to Defendant Officers and Defendant Klaczynski that coercing a false confession, fabricating evidence, and suppressing exculpatory evidence, in addition to the other misconduct alleged above, in order to frame Wright, would inevitably result in extreme harm to him. Avoiding this injury to Wright would not have burdened Defendant Officers or Defendant Klaczynski in any way.

187.     Notwithstanding that duty, Defendant Officers and Defendant Klaczynski acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Wright's rights.

188.     As a direct and proximate result of Defendants' misconduct, Wright suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT XI – State Law Claim
### *Respondeat Superior*

189.     Each paragraph of this Complaint is incorporated as if restated fully herein.

190.     In committing the acts alleged above, each of the Defendant Officers were members and agents of, the CPD, acting at all relevant times within the scope of their employment and under color of law.

191.     Defendant City of Chicago is liable as principal for all torts committed by its agents under state law.

192.     In committing the acts alleged in the preceding paragraphs, Defendant Klaczynski was an employee of, and agent of, CCSAO, acting at all relevant times within the scope of his employment and under color of law.

193.     Defendant Cook County is liable for torts committed by its agents under state law.

**COUNT XII – State Law Claim**
**Indemnification**

194.     Each paragraph of this Complaint is incorporated as if restated fully herein.

195.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

196.     Defendant Officers are or were employees of the CPD, who acted within the scope of their employment in committing the misconduct described herein.

197.     Defendant City of Chicago is responsible for paying any judgment entered against the Defendant Officers. Wright therefore demands judgment against Defendant City of Chicago in the amounts awarded to Wright against the individual Defendant Officers as damages, attorneys' fees, costs, and interest.

198.     Defendant Klaczynski was an employee of CCSAO, who acted within the scope of his employment in committing the misconduct described herein.

199.    Cook County is responsible for paying any judgment entered against Defendant Klaczynski. Wright therefore demands judgment against Defendant Cook County in the amounts awarded to Wright against Defendant Klaczynski as damages, attorneys' fees, costs, and interest.

WHEREFORE, Plaintiff DAVID WRIGHT respectfully requests that this Court enter a judgment in his favor against Defendants THE CITY OF CHICAGO, KENNETH BOUDREAU, JAMES CASSIDY, J. GANDURSKI, JOHN HALLORAN, RICHARD ZULEY, STEVEN KLACZYNSKI, and COOK COUNTY, ILLINOIS, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individually named Defendants, pre- and post-judgment interest, equitable and injunctive relief against the CITY OF CHICAGO, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff DAVID WRIGHT hereby demands a trial by jury pursuant to Federal Rules of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

DAVID WRIGHT

BY: /s/ David B. Owens
        *Attorney for Plaintiff*

David B. Owens                    Elizabeth Wang
LOEVY & LOEVY                     LOEVY & LOEVY
311 N. Aberdeen St.               2060 Broadway, Ste. 460
Chicago, IL 60607                 Boulder, CO 80302
O: 312.243.5900                   O: 720.328.5642
david@loevy.com                   elizabethw@loevy.com
*Attorneys for Plaintiff*